J-S31034-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LAWRENCE REDDICK | : | |
| | : | |
| Appellant | : | No. 1638 WDA 2018 |

Appeal from the Judgment of Sentence Entered June 22, 2018
In the Court of Common Pleas of Beaver County Criminal Division at
No(s):  CP-04-CR-0002369-2016

BEFORE:  OLSON, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:           FILED SEPTEMBER 24, 2019

Lawrence Reddick appeals from the judgment of sentence entered following his jury trial convictions for the first-degree murder of Dane Mathesius, the second-degree murder of William Cade Booher, conspiracy to commit robbery, three counts of robbery, and one count each of aggravated assault, firearms not to be carried without a license, and recklessly endangering another person ("REAP").[1] Reddick challenges the sufficiency and weight of the evidence, the legality of his sentence, and the discretionary aspects of his sentence. We affirm.

The trial court set forth the factual and procedural history of this case, which we adopt and incorporate herein. Trial Court Opinion, filed Dec. 18, 2018, at 1-11 ("1925(a) Op.").

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 2502(b), 903(a)(1), 3701(a)(1)(i), 2702(a)(1), 6106(a)(1), and 2705, respectively.

Following trial, a jury convicted Reddick, who was 17 years old at the time of the crime, of the above-referenced offenses. The trial court sentenced Reddick to a term of 30 years to life imprisonment for the second-degree murder conviction, 35 years to life imprisonment for the first-degree murder conviction, nine to 20 years' imprisonment for two of the robbery convictions, five to ten years' imprisonment for the third robbery conviction, four to ten years' imprisonment for the conspiracy conviction, five to ten years' imprisonment for the aggravated assault conviction, and two to four years' imprisonment for the carrying a firearm without a license conviction. The court imposed no further penalty for the REAP conviction, as it merged for sentencing purposes. The court ordered that the sentences for the murder convictions run consecutively to each other.

Reddick filed a post-sentence motion[2] challenging the sufficiency and weight of the evidence, the legality of his sentence, and the discretionary aspects of his sentence. The trial court denied the motion. Reddick filed a timely notice of appeal.

Reddick raises the following issues:

> I. Whether [Reddick's] conviction should be reversed because the Commonwealth failed to present sufficient evidence to prove [Reddick's] guilt beyond a reasonable doubt?

_____

[2] Reddick filed a request to file a post sentence motion nunc pro tunc, which the trial court granted. He then filed his post-sentence motion.

II. Whether [Reddick's] conviction should be reversed because the verdict goes against the weight of the evidence presented by the Commonwealth at trial?

III. Whether [Reddick's] sentence of 65 years to life is an illegal sentence, as it creates a de facto life without the possibility of parole sentence, unconstitutional under [Commonwealth v. Batts, 163 A.3d 410 (Pa. 2017)]?

IV. Whether the court abused its discretion at sentencing by running [Reddick's] first degree murder sentence and second degree murder sentence consecutively to each other creating a de facto life without the possibility of parole sentence unconstitutional under Batts?

Reddick's Br. at 8.

In his first claim, Reddick argues the evidence was insufficient to support the convictions. In his second claim, he contends the verdict was against the weight of the evidence. For both claims, he argues that two Commonwealth witnesses, Deonte Jones and Rasheid Hicks, lied to law enforcement during the investigation, and that the eye-witness to the shooting did not see the shooter's face or what clothes the shooter was wearing.

Reddick's claims challenge the credibility of the witnesses, which is challenge to the weight of the evidence, not a challenge to the sufficiency of the evidence. Commonwealth v. Palo, 24 A.3d 1050, 1055 (Pa.Super. 2011) (where appellant challenged credibility of witness, he challenged weight, not sufficiency, of evidence).

When reviewing a challenge to the weight of the evidence, we review "the trial court's exercise of discretion." Commonwealth v. Johnson, 192 A.3d 1149, 1152-53 (Pa.Super. 2018) (quoting Commonwealth v. Hicks, 151 A.3d 216, 223 (Pa.Super. 2016)). A reversal of a verdict is not warranted

- 3 -

"unless it is so contrary to the evidence as to shock one's sense of justice." Id. at 1153 (quoting Hicks, 151 A.3d at 223). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." Commonwealth v. Cramer, 195 A.3d 594, 600 (Pa.Super. 2018) (quoting Commonwealth v. Talbert, 129 A.3d 536, 545 (Pa.Super. 2015)). The fact-finder also has the responsibility of "[r]esolving contradictory testimony and questions of credibility." Id. (quoting Commonwealth v. Hopkins, 747 A.2d 910, 917 (Pa.Super. 2000)). We give great deference to the trial court's decision regarding a weight of the evidence claim because it "had the opportunity to hear and see the evidence presented." Id. (quoting Talbert, 129 A.3d at 546).

The trial court set forth the applicable law. 1925(a) Op. at 28-29. It found the verdict was not against the weight of the evidence, noting the jury was free to determine the credibility of the witnesses. Id. at 29-30. We agree and conclude the verdict was not against the weight of the evidence. We affirm on the basis of the trial court opinion, which we adopt and incorporate herein. Id. at 28-30.

Further, if Reddick had raised a sufficiency claim, we would conclude the claim lacked merit.

The trial court set forth the law on sufficiency of the evidence and the elements for each of the crimes. 1925(a) Op. at 14-24. It concluded that the Commonwealth presented sufficient evidence to support the convictions,

including the testimony of Deontae Jones, Xavier Fisher, and Rasheid Hicks that they heard Reddick and Fisher planning the robbery; Jones' testimony of the details of the planning, which began days before the robbery occurred; surveillance footage from the location of the meeting; text messages sent between Fisher's phone and Mathesius' phone; N.R.'s testimony about how the robbery occurred; Jones' and Hicks' testimony that they left the area after they heard the gunshots, and met Reddick down the street; and testimony that Reddick cleaned the gun and tossed it into the bushes. Id. at 13, 24-28. We agree that the Commonwealth presented sufficient evidence to establish Reddick committed the crimes. We would therefore affirm on the basis of the trial court opinion, which we adopt and incorporate herein. See id. at 12-28.

In his third claim, Reddick claims the aggregate sentence imposed of 65 years' to life imprisonment is an illegal de facto life sentence. He reasons that such a sentence is illegal following Miller v. Alabama, 567 U.S. 460 (2012). Reddick relies on cases from other jurisdictions to support his claim that a sentence is illegal where separate consecutive sentences result in a de facto life sentence.

A person under the age of 18 who commits murder cannot be sentenced to life without parole unless the Commonwealth proves "beyond a reasonable doubt, that the juvenile offender is permanently incorrigible and thus is unable to be rehabilitated." See Commonwealth v. Batts, 163 A.3d 410, 459 (Pa. 2017). In Commonwealth v. Foust, this Court concluded that "de facto life sentences are cruel and unusual punishment when imposed on juveniles

convicted of nonhomicide offenses or juvenile homicide offenders capable of rehabilitation." 180 A.3d 416, 434 (Pa.Super. 2018). In Foust, however, we also concluded that courts "must consider the individual sentences, not the aggregate, to determine if the trial court imposed a term-of-years sentence which constitutes a de facto [life without parole] sentence." Id. at 438. The court concluded that a term of 30 years to life imposed on a juvenile did not constitute a de facto life imprisonment sentence. Id.

Pursuant to Foust, we must view Reddick's sentences as separate sentences to determine whether the trial court imposed a de facto sentence of life imprisonment. As in Foust, we conclude that Reddick's separate sentences of 30 years to life and 35 years to life do not constitute de facto life sentences and, therefore, the sentences imposed by the trial court are not illegal.

In his final claim, Reddick claims the trial court abused its discretion in imposing the consecutive sentences. Reddick claims that by relying on policies in place before Batts that provide that concurrent sentences would fail to account for the gravity of the crimes, the "court abused its discretion in creating a de facto life without parole sentence." Reddick's Br. at 20.

Before addressing the merits of his discretionary aspects of sentence claim, we must determine whether: (1) the appeal is timely; (2) the issue was preserved; (3) the brief includes concise statement of reasons relied on for appeal; and (4) a substantial question is raised. See Commonwealth v. Edwards, 194 A.3d 625, 636 (Pa.Super. 2018).

Here, Reddick filed a timely notice of appeal and preserved the issue in his post-sentence motion and Rule 1925(a) statement. Reddick did not include in his brief a concise statement of the reasons relied upon for appeal. However, because the Commonwealth did not object to this failure, the absence of the statement does not preclude are review. See Commonwealth v. Kiesel, 854 A.2d 530, 533 (Pa.Super. 2004) ("[W]hen the appellant has not included a Rule 2119(f) statement and the [Commonwealth] has not objected, this Court may ignore the omission and determine if there is a substantial question that the sentence imposed was not appropriate"). Further, we conclude that Reddick's claim, that the court imposed consecutive sentences that resulted in an excessive sentence, raises a substantial question. See Foust, 180 A.3d at 439. We will therefore review the claim.

We review a challenge to the sentence imposed for an abuse of discretion and will not disturb a sentence unless the trial court abused its discretion. Commonwealth v. Bullock, 170 A.3d 1109, 1126 (Pa. Super. 2017). The Sentencing Code provides,

> [T]he sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S.A. § 9721(b). "The [trial] court is not required to parrot the words of the Sentencing Code, stating every factor that must be considered under Section 9721(b), however, the record as a whole must reflect due consideration by the court of the statutory considerations at the time of

- 7 -

sentencing." Bullock, 170 A.3d at 1126 (internal alterations, quotation marks, and citation omitted).

Here, the court concluded:

> The undersigned has presided over this case since formal arraignment, and has conducted a careful review of the record. The Court has considered the presentence report, the sentencing guidelines, and all of the evidence presented and the arguments given at the sentencing hearing.
>
> The Court has considered all of the factors provided for by section 9721(b) of the Sentencing Code, including the protection of the public, the gravity of the offense, the impact on the victims, the impact on the community, and [Reddick's] rehabilitative needs. The Court has considered [Reddick's] various age-related characteristics as stated in Miller, 567 U.S. at 477-78, 132 S.Ct. at 2468, and in [Commonwealth v. Melvin, 172 A.3d 14, 22 n.5., (Pa.Super. 2017)] . . . . The Court recognizes that [Reddick], who was convicted of committing this crime as a juvenile, is constitutionally different from, and thus less culpable than, an adult.
>
> There are, however, numerous aggravating circumstances in this case which must also be considered. The evidence presented at trial showed a person who was approximately two months shy of being a legal adult, who made knowing decisions to conspire with others to commit an armed robbery at a false drug deal for $160 worth of marijuana. After robbing the victims, [Reddick] then killed William Cade Booher, who was seated next to him, by shooting him five times in the area of his head and neck. Dr. Luckasevic, who conducted the autopsy, testified that the shots were fired within inches of the victim's face, and that one of the shots was fired while the weapon was pressed tightly in contact with the victim's face. [Reddick] then got out of the car. Rather than simply fleeing with the stolen items, [Reddick] instead proceeded to the back of the car where he continued firing at the occupants. One shot struck Dane Mathesius in the back, resulting in his death. Thirteen-year-old [N.R.] fortunately escaped physical injury. However, he is left with the emotional scars of being the victim of an armed robbery

where he witnessed the bloody aftermath of his friend's murder from only a car seat away. After leaving the scene, [Reddick] concealed evidence of the murder by cleaning off the murder weapon and hiding it in another person's yard. [Reddick] then gave some marijuana to Rasheid Hicks. Later that night, [Reddick] contacted his co-conspirator, Deontae Jones, to warn him not to say anything.

Trial Court Opinion, filed June 22, 2018, at 11-12; see also N.T., 6/22/2018, at 48-73 (reviewing relevant law, facts of the case, gravity of the crimes, the pre-sentence report, and mental health evaluation, and imposing sentence).

This was not an abuse of discretion, and Reddick is not entitled to relief on this claim. See Foust, 180 A.3d at 440-41 (finding court did not abuse its discretion in imposing consecutive sentences for two murder convictions committed while defendant was juvenile, where trial court found "that separate punishments were necessitated by the nature of the offenses and the lives taken, notwithstanding the rehabilitation Appellant demonstrated while imprisoned for the past two decades").

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/2019

- 9 -

JUDY R. ENSLEN
CLERK OF COURTS

2018 DEC 19 AM 11:07 **IN THE** COURT OF COMMON PLEAS OF BEAVER COUNTY
**BY THE COURT**

BEAVER COUNTY
PENNSYLVANIA

PENNSYLVANIA

CRIMINAL DIVISION

**2018 DEC 18 P 4: 31**

COMMONWEALTH OF PENNSYLVANIA : NO. CP-04-CR-2369-2016

KIM TESLA
JUDGE

V. :

LAWRENCE REDDICK, :

DEFENDANT : SUPERIOR COURT NO. 1638 WDA 2018

**DECEMBER 18 , 2018**

TESLA, J.

# OPINION

## I. INTRODUCTION

This Opinion is entered pursuant to Pa.R.A.P. 1925(a) in order to address Defendant's direct appeal of the Court's Sentence Order entered on June 22, 2018. Defendant was convicted after a jury trial of, *inter alia*, one count of first degree murder and one count of second degree murder, each committed in the course of an armed robbery and conspiracy. Defendant raises claims against the weight and sufficiency of the evidence, and against the legality and discretionary aspects of the sentence imposed. For the reasons stated in this Opinion, Defendant's claims have no merit and the Sentence Order of the Court should be affirmed.

## II. FACTS AND PROCEDURAL HISTORY

On October 7, 2016, a Criminal Complaint was filed by Detective Captain Ryan Pudik, Detective Bonnie Sedlacek, and Detective Timmie Patrick, charging Defendant with the criminal homicides of Dane Mathesius and of William Cade Booher. The Complaint also charged Defendant with conspiracy to commit robbery; robbery of Dane Mathesius, William Cade Booher, and N.R. (a minor victim); aggravated assault; discharging a firearm into an occupied structure; and recklessly endangering another person. A preliminary hearing was held on

November 10, 2016. At the preliminary hearing, the Commonwealth amended the Criminal Complaint to include one count of firearms not to be carried without a license. N.T., Preliminary Hearing, 11/10/16, at 5-6. The charges were all held for Court. The Commonwealth then filed the same charges in an Information on November 28, 2016, omitting only the charge of discharging a firearm into an occupied structure. Formal arraignment was held on December 12, 2016. The same day, the Commonwealth filed a Notice of Joinder, consolidating this case with the case of Defendant's co-defendant, Ronald Foster, docketed at <u>Commonwealth v. Foster</u>, No. CP-04-CR-2368-2016.[1]

On January 19, 2017, Defendant filed a Motion for Transfer of Jurisdiction, seeking to decertify Defendant's case and transfer it to the juvenile court. On January 31, 2017, Defendant moved to continue the case pending the outcome of his Motion to Transfer, and trial was specially scheduled for August 7, 2017. The Court then held numerous status conferences on this case as required by the Pennsylvania Rules of Criminal Procedure to address Defendant's Motion to Transfer.[2] On June 20, 2017, Defendant filed a Motion for Severance, claiming that Defendant would be prejudiced by being tried with his co-defendant, Foster, based upon Foster's statements to law enforcement. On July 14, 2017, the Court entered an Order granting Defendant's Motion for Severance. On July 19, 2018, Defendant filed a Motion to continue the trial from August 7, 2017, to April 9, 2018, due to Defendant seeking an evaluation for purposes of his pending decertification. The Court granted Defendant's Motion.

---

[1] Jury Selection in Foster's case began on August 7, 2017, and the trial commenced on August 14, 2017. The jury returned a verdict on September 5, 2017, finding Foster guilty as an accomplice to two counts of third degree murder, one count of conspiracy to commit robbery, three counts of robbery, and one count of criminal use of a communication facility. Foster was sentenced on October 17, 2017 to an aggregate sentence of thirty-four to seventy years. His case is currently pending direct appeal before the Superior Court at No. 505 WDA 2018.

[2] The status conferences were held pursuant to Pa.R.Crim.P. 595, *et seq.*

2

On November 13, 2017, Defendant filed a Motion to Withdraw Petition for Transfer of Jurisdiction. The Court gave Defendant a colloquy, and Defendant stated that he wished to go forward with trial, and that this was a decision he was making with his counsel as part of his trial strategy. N.T., Status Conference, 11/9/17, at 30-31. The Court entered an Order on November 13, 2017, granting Defendant's Motion to Withdraw his request for decertification.

On March 27, 2018, Defendant filed a Motion in Limine seeking exclusion of certain photographs from being admitted into evidence. On the same day, the parties filed written stipulations for use at trial.

Jury selection commenced on April 9, 2018 and concluded the next day on April 10, 2018. N.T., Jury Trial, Vols. I-IV, 4/9/2018-4/10/2018. The Court then made its final rulings on Defendant's Motion in Limine after concluding jury selection and before commencing trial. N.T., Jury Trial, Vol. IV, 4/10/18, at 67-87. Trial commenced on April 11, 2017. The Commonwealth's evidence, including witnesses, surveillance footage, and photographs, as well as documentary and physical evidence, demonstrated the following facts.

On September 18, 2016, Ronald Foster communicated through text messages with Dane Mathesius, an eighteen-year-old man who lived in Beaver, Pennsylvania. Cmwlth. Ex. 156. The text messages indicated that Foster wanted to buy marijuana from Mathesius, but Mathesius did not have any at the time.[3] Id. On September 28, 2016, Foster again contacted Mathesius through text message, indicating that he wanted to buy marijuana. Id. Mathesius indicated that he could get it for him, and that he would set up a drug deal the following day. Id. Unknown to Mathesius, Foster was not planning to purchase the drugs from him, but rather was planning to rob him, and was initiating a conspiracy to that effect. N.T., Jury Trial, Vol. VIII, 4/16/18, at 105-110. Foster

---

[3] The Commonwealth introduced a spreadsheet of the text messages which were communicated between Foster's and Mathesius' cellphones. Cmwlth. Ex. Cmwlth. Ex. 156. The Commonwealth also had the entirety of the text messages read into the record. N.T., Jury Trial, Vol. IX, 4/17/18, at 104-133.

3

informed one co-conspirator, Deontae Jones, of his plan a few days in advance. Id. at 105-07, 163. Foster also informed Defendant about the plan, and asked if he could use Defendant's gun in the robbery. Id. at 107-08, 163-64. Defendant told Jones that his gun could not be used unless Defendant also came. Id. at 108, 164.

On September 29, 2016, Mathesius contacted Foster through text message, seeking to set up the drug deal they had discussed the day before. Cmwlth. Ex. 156. Foster, along with Deontae Jones and Xavier Fisher, all of whom played for the Aliquippa football team, left afternoon football practice to watch a volleyball game at the high school. Foster, Jones, and Fisher then walked down towards Plan 12 Market in Aliquippa, where they met Defendant at his father's house, which was nearby. N.T., Jury Trial, Vol. VIII, 4/16/18, at 40-43, 110-11. Foster, Jones, and Defendant formed a plan where they would rob Mathesius of the drugs. Id. at 115, 123. After learning of the intended robbery, Fisher left the scene and asked his mother to come and pick him up, which she did, and then took him home. Fisher had no further involvement in the events that later occurred. N.T., Jury Trial, Vol. VIII, 4/16/18, at 46-50.

Also present while Foster, Jones, and Defendant were planning the robbery was Rasheid Hicks, a friend of Defendant's. Hicks testified that he was walking towards Plan 12 Market, where he overheard a conversation between Foster, Jones, Defendant, and Fisher. N.T., Jury Trial, Vol. IX, 4/17/18, at 140. Hicks testified that he heard Foster say "I have a lick," which Hicks knew to mean a robbery. Id. Hicks testified that he heard Defendant say, "Does he know where to go?" Id. Hicks testified that Foster said, "I don't have no weapon," and that Defendant replied, "You can use mine. . . I have to go home and get mine." Id. at 141. Hicks testified that he heard Jones say, "I don't have anything to cover my face," and that Foster replied, "You can use my shirt." Id. Jones refused, saying it was sweaty. Id. Hicks testified that Fisher then said, "I

don't want any part of this," and left. Id. at 142. Hicks testified that Foster was texting during the conversation. Id.

Foster and Defendant were discussing the robbery before Fisher left. Fisher also heard Foster say, "I got a lick," "We can't do this with [Booher] in the car;" and, "do we have a gun?" N.T., Jury Trial, Vol. VIII, 4/16/18, at 45-46. The conspirators learned through text messages with Mathesius that sixteen-year-old Booher would be with him when he arrived to sell the drugs. Id. at 142-43; Cmwlth Ex. 156. Unknown to Foster, Jones, and Defendant, a friend of Booher's would also be in the car: thirteen-year-old N.R.[4] Foster and Defendant came to an agreement that the robbery would take place down the street from the Plan 12 Market at a nearby abandoned building with graffiti on it. N.T., Jury Trial, Vol. VIII, 4/16/18, at 123, 166. The building was located at the intersection of Meadow St. and Irwin St., known to local residents as "Wall Street." Foster, Jones, and Defendant then walked to Defendant's other house. Id. at 122-24, 129.[5] Jones testified that he remained on the porch watching sports highlights on his cellphone while Foster and Defendant went inside. Id. at 130. Jones testified that they decided to go there to get Defendant's gun, and that Defendant later showed Jones that he had a gun. Id. at 131-32, 174. Foster, Jones, and Defendant then went back to the abandoned building. Id. at 132, 170.

Jones testified that Hicks was at the abandoned building when they returned, and that Jones' cousin Tariq drove by. Id. at 133-36. Jones asked for something to conceal his face because of his involvement in the planned robbery. Id. at 133-36, 175. Jones further testified that

---

[4] The Court uses the initials of the minor victim, N.R., in this case, rather than the victim's name, for the purposes of protecting the victim's privacy.

[5] The other house was shown through other evidence to be the home of Defendant's mother, Shelina, located at 1226 Irwin St. The house near Plan 12 Market where Defendant met Foster and Jones was the home of his father, Lawrence, Sr., located at 1103 Main St. E.g., N.T., Jury Trial, Vol. X, 4/18/18, at 67 (Captain Pudik testifying concerning the execution of search warrants on those two houses and the residents who lived there).

5

Foster asked him to be a decoy for the robbery by being the one to act like he wanted to buy the marijuana, but Jones refused. Id. at 137-38. Foster gave Defendant money in order to make it look like they had enough to buy the marijuana. Id. at 138-39. He said that while they were there, Foster gave Defendant his cellphone, and that Defendant used it to call and send text messages. Id. at 139-41. Defendant told them that the individuals from Beaver were on their way, and told Foster and Jones to wait by the side of the building. Id. at 142-46, 177. Jones saw a silver car occupied by white males drive by, and then come back. He heard Defendant call out, "Yo," to the car, heard the car door open and close, and then saw the car pull away and make a right turn. Id. at 147-50, 178-79.

N.R., who was thirteen years old at the time, testified that on September 29, 2016, he was with his friend, Booher, who was sixteen years old. They walked over to the Wooden Indian restaurant in Beaver to meet Dane Mathesius. N.T., Jury Trial, Vol. V, 4/11/18, at 166-69. Booher told N.R. that he and Mathesius were going to sell marijuana. Id. at 167, 171-72; N.T., Jury Trial, Vol. VI, 4/12/18, at 52. N.R. and Booher were picked up by Mathesius at the Wooden Indian parking lot. Mathesius drove the car while N.R. was seated in the front passenger seat, and Booher was seated in the rear passenger seat on the driver's side. N.T., Jury Trial, Vol. V, 4/11/18, at 169-70; Cmwlth. Ex. 44. On their way towards Aliquippa, Mathesius pulled the car over into the parking lot of King's Pool and Spa, where Booher then weighed the marijuana to be sold, using a scale. N.T., Jury Trial, Vol. V, 4/11/18, at 175-77. They expected to sell twelve grams of marijuana for $140. Id. at 177-78; N.T., Jury Trial, Vol. VI, 4/12/18, at 52-53. Mathesius told N.R. to text the person he had been contacting and to tell them that they would meet them at Plan 12 Market. N.T., Jury Trial, Vol. V, 4/11/18, at 178-80. N.R. testified that Booher kept indicating that he was afraid they would be robbed. Id. at 180, 195. N.R. also

6

testified that he had a bad feeling, and that he called and texted his mother from Mathesius' cellphone, asking her to pick him up, but there was no answer. Id. at 181-82.

Once they arrived in Aliquippa, Mathesius drove by the abandoned building with the graffiti several times, at one point going the wrong way down a one-way street. Id. at 183-94. N.R. saw a person in a white hoodie and a person in a red hoodie standing by the building. Id. at 184. The evidence later showed that the one wearing the white hoodie was Defendant, and the one wearing the red hoodie was Hicks. Mathesius stopped the car near the building and the one wearing the white hoodie got into the rear passenger side seat. N.T., Jury Trial, Vol. VI, 4/12/18, at 20-22. Mathesius began driving and Booher asked Defendant if he had the money. Id. at 22, 26. Defendant said yes, but then pulled out a handgun, waved it around, and said, "This is a stick up." Id. at 22-23, 26-30, 55. Defendant then told Mathesius to pull over, which he did. Id. at 28-29. Defendant told them to give him the drugs and asked if they had anything. Id. at 29. Mathesius showed Defendant his empty wallet, and N.R. concealed $50 he was carrying in the car seat behind him. Id. at 29-30, 55-56. As Booher handed over money and drugs to Defendant, N.R. put his head down. Id. at 29-31, 58. He then heard a series of gunshots. Id. at 31, 58. He heard the person in the back, Defendant, get out. Id. at 31-32, 65. When he looked up, Mathesius had also gone. Id. at 32-33, 59. He looked back and saw Booher, who had been shot multiple times in the area of his head and neck. Id. at 32, 65-66. He said Booher's name several times and then ran from the vehicle looking for help before arriving at the house of Erin Terry, who called 911. N.T., Jury Trial, Vol. V, 4/11/18, at 134-35; N.T., Jury Trial, Vol. VI, 4/12/18, at 32-34; Cmwlth. Ex. 39. N.R. later identified the person in the white hoodie as Defendant from high school surveillance footage he was shown by detectives. N.T., Jury Trial, Vol. VI, 4/12/18, at 36-48; N.T., Jury Trial, Vol. VIII, 4/16/18, at 8-10; Cmwlth. Ex. 48, 59, 50.

7

Deontae Jones testified that after he heard Defendant enter the car, which then drove away, and after they heard the gunshots, he and Foster left the area. N.T., Jury Trial, Vol. VIII, 4/16/18, at 147-50, 180-81. Jones testified that he and Foster encountered Defendant at an intersection down the street. Id. at 151, 182. Defendant asked to be checked to see if he had been hit, and Foster said that he was not. Id. at 152. Jones testified that Foster asked Defendant what happened, and Defendant indicated that he "pushed his shit back," meaning that he shot someone. Id. at 152. Jones and Foster then left together. Id. at 153. Jones further testified that Defendant communicated with him by video using Snapchat, and told him not to say anything about what had happened. N.T., Jury Trial, Vol. VIII, 4/16/18, at 153-54.

Hicks testified that he encountered Defendant, Jones, and Foster after running from the building once he heard the gunshots. He testified that Defendant asked him also to check if he was shot. N.T., Jury Trial, Vol. IX, 4/17/18, at 151; N.T., Jury Trial, Vol. X, 4/18/18, at 36-37. Defendant and Hicks then walked down the street and cut through a yard where Defendant cleaned off the murder weapon with his sleeve and threw it into some bushes. N.T., Jury Trial, Vol. V, 4/11/18, at 65-67; N.T., Jury Trial, Vol. IX, 4/17/18, at 152-155; N.T., Jury Trial, Vol. X, 4/18/18, at 37-38. Defendant and Hicks then went to Defendant's father's house where Defendant provided marijuana to Hicks. N.T., Jury Trial, Vol. IX, 4/17/18, at 155-57; N.T., Jury Trial, Vol. X, 4/18/18, at 39.

After receiving the 911 calls from Erin Terry and others, the Aliquippa Police and detectives from the Beaver County Detectives Bureau responded, secured the crime scene, collected evidence, and conducted an investigation. The rear driver's side passenger window had been blasted out, and shots had been fired into the car's rear windshield, trunk lid, and bumper from outside the vehicle. Investigators found a revolver with a spent round in the cylinder

8

beneath the right elbow of Booher. The revolver was later found to have been stolen from N.R.'s grandfather. N.T., Jury Trial, Vol. VI, 4/12/18, at 150-53. Investigators also found what appeared to be a gunshot perforation through the rear windshield, and through the driver's seat, with polyurethane foam from the seat visible. Id. at 188.

The investigators then made painstaking efforts to locate Dane Mathesius, who was missing. Ryan Pudik, a detective and captain with the Aliquippa Police Department, as well as Detective Robert Heberle and Detective Timmie Patrick of the Beaver County Detectives Bureau, each testified to the extent of the efforts to locate Mathesius. N.T., Jury Trial, Vol. VI, 4/12/18, at 137-143, 212-13; N.T., Jury Trial, Vol. VII, 4/13/18, at 113-14. The investigators checked at the homes of Mathesius' parents, but did not find him there. They were given his cellphone number, and attempted to text message him without receiving any response. They contacted AT&T, Mathesius' cellphone service provider, for an emergency ping, but without success. They re-contacted Mathesius' parents the next day and interviewed his friends to try to locate him. They logged Mathesius as a missing person through the 911 center. They searched abandoned buildings in Aliquippa. They used a drone to canvass the area, and contacted the Pennsylvania State Police, which provided a helicopter with thermal imaging, but were unable to locate him. With assistance from Search and Rescue and various local police departments, approximately two to three hundred people, they conducted a ground search of the area of Aliquippa without success. Finally, on October 4, 2016, a phone call was received about a body being found in a back yard. Id. at 143-44.

Police proceeded to Irwin St, where the owner of the property directed them to a space between his house and fence in his back yard. They discovered a body, later confirmed to be the body of Mathesius. They secured the crime scene and retrieved Mathesius' iPhone from his

body. The iPhone was later sent to the Pennsylvania State Police for forensic extraction. Mathesius suffered a single gunshot wound, which entered his back. The gunshot wound had polyurethane foam in it, which was later tested and found to be consistent with the foam from the driver's seat. Id. at 226-28; Cmwlth. Ex. 111, 112.

The autopsies of Mathesius and Booher were conducted by Dr. Todd Luckasevic. N.T., Jury Trial, Vol. VI, 4/12/18, at 84, 110; Cmwlth. Ex. 114, 115, 116, 117. He described the autopsy procedure and the differences in the appearance of gunshot wounds based upon the distance from which they were fired. N.T., Jury Trial, Vol. VI, 4/12/18, at 76-82. Dr. Luckasevic testified that Booher suffered "massive gunshot wound trauma to his head and face," consisting of five gunshots to his head and neck area. Id. at 85, 87-87. He testified that the stippling of the wounds indicated that multiple shots were fired from a close proximity, that the wound to the right corner of the mouth was a tight contact wound, and that Booher may also have suffered a possible superficial grazing wound to his right elbow from a bullet that was fired into the trunk lid and which passed through the rear seat of the car and ultimately landed on the floor in front of the driver's seat. Id. at 92-102. Dr. Luckasevic testified that Mathesius suffered an entrance wound to his right upper back which penetrated his right lung and subclavian vein. Id. at 112-114. The fatal bullet was recovered from his sternoclavicular joint, which Dr. Luckasevic described as being where the collarbone meets the breastbone. Id. at 114. He testified that the wound would not have been immediately incapacitating and that it would take minutes to bleed out. Id. at 114-15. Dr. Luckasevic testified that Booher and Mathesius died as a result of their respective gunshot wounds, and that the manner of death was homicide. Id. at 120.

Defendant rested, opting not to testify, and choosing not to present any witnesses or evidence. N.T., Jury Trial, Vol. X, 4/18/18, at 85, 108-115.

10

The jury returned a verdict on April 23, 2018, finding Defendant guilty of the second degree murder of William Cade Booher and the first degree murder of Dane Mathesius. The jury further found Defendant guilty on all other counts. The Court then entered an Order scheduling sentencing and ordering a full pre-sentence report.

A sentencing hearing was held on June 22, 2018. The Court entered an Opinion and a Sentence Order the same day, imposing a sentence of (a) the mandatory minimum of thirty years to life imprisonment for the second degree murder of Booher; (b) the mandatory minimum of thirty-five years to life imprisonment for the first degree murder of Dane Mathesius; (c) nine to twenty years for each count of robbery relating to Dane Mathesius and Booher, the victims who were killed; (d) five to ten years for the robbery relating to N.R.; (e) four to ten years for the count of conspiracy to commit robbery; (f) five to ten years for the aggravated assault of N.R.; and (g) two to four years for carrying a firearm without a license. The Court imposed no further penalty for the count of recklessly endangering another person because of merger. The Court ran the two murder convictions consecutively and the remaining convictions concurrent to the two murder convictions, for an aggregate sentence of sixty-five years to life imprisonment.

On July 6, Defendant filed a Post-Sentence Motion Nunc Pro Tunc. The Commonwealth advised the Court that it consented to Defendant's filing the Motion *nunc pro tunc*. The Court entered an Order on July 12, 2018, expressly granting Defendant's permission to file his Motion *nunc pro tunc*. Defendant filed an Amended Post Sentence Motion Nunc Pro Tunc on August 29, 2018, raising the issues of the weight and sufficiency of the evidence, and the legality and discretionary aspects of the sentence.

The Court held oral argument in this case on September 20, 2018. On October 16, 2018, the Court entered an Order denying Defendant's Amended Post-Sentence Motion. On November

11

13, 2018, Defendant filed a Notice of Appeal. On November 14, 2018, the Court entered an Order directing Defendant to file a Concise Statement of Matters Complained of on Appeal, which Defendant filed on December 5, 2018. In his Concise Statement, Defendant raises the same issues he raised previously in his Amended Post-Sentence Motion. The Court next addresses each of Defendant's issues in turn.

## III. ANALYSIS

### A. The evidence presented at trial was sufficient.

#### 1. Standard of Review.

Defendant claims that the evidence in this case was insufficient. Defendant was convicted of one count of first degree murder, one count of second degree murder, three counts of robbery, one count of criminal conspiracy to commit robbery, one count of aggravated assault, one count of recklessly endangering another person, and one count of firearms not to be carried without a license.

There was direct evidence from Deontae Jones, Xavier Fisher, and Rasheid Hicks that they heard Defendant and Foster discuss the planning of a robbery. Jones, one of Defendant's co-conspirators, testified at length as to the manner in which the robbery was planned. Jones testified that Foster began planning the robbery days before it occurred. N.T., Jury Trial, Vol. VIII, 4/16/18, at 105-07, 163. Jones testified that Defendant approached him at school, saying Defendant had talked to Foster, that Foster wanted to use Defendant's gun, and that Defendant would not let him unless Defendant was also there. Id. at 108, 164. Jones testified that they discussed using him as a decoy, that they discussed pooling their money to make it appear that they were going to purchase the drugs, and that Jones wanted to conceal his identity. Jones testified how they went to Defendant's house in order to get a gun, and how Defendant later

12

revealed to Jones that he, in fact, had his gun on him. Jones further testified how Foster and Defendant set up the meeting location with Mathesius through text messages, using Foster's cellphone, and how Defendant told Foster and Jones to move away to the side of the building before Mathesius arrived.

The Commonwealth corroborated Jones' testimony with other evidence. The Commonwealth presented the surveillance footage from Plan 12 Market showing the meeting between Defendant, Foster, and Jones, as well as with the evidence of the forensic extraction from Mathesius' cellphone, which showed the text messages that were sent between Mathesius' cellphone and Foster's. Again, Hicks testified also to hearing Foster's discussions with Defendant and Jones about setting up the robbery. Fisher also heard Foster say to Defendant and Jones that he had a lick, that Booher would be present, and that they needed a gun. N.R. testified as to how the actual robbery occurred, with Defendant saying, "This is a stick up," brandishing a gun, and demanding drugs and money. Defendant then fired five shots into Booher's head and neck at close range, before exiting and firing additional shots from outside of the car, one of which struck Mathesius in the back and ultimately resulted in his death. Jones and Hicks testified that they heard the shots, left the area, and encountered Defendant down the street, where he asked to be checked for wounds. Hicks then left with Defendant, who cleaned the gun with his sleeve and tossed it into some bushes. Defendant later told Jones through social media not to say anything about what had happened. N.T., Jury Trial, Vol. VIII, 4/16/18, at 153-54.

Defendant, after being given a thorough colloquy, informed the Court that he did not wish to testify, and that he did not want to present any witnesses or evidence. Defendant's counsel argued to the jury that the Commonwealth did not meet its burden to prove that Defendant was the shooter.

13

For a defendant's conviction to be upheld, evidence sufficient to find him guilty beyond a reasonable doubt must have been presented at trial. Commonwealth v. Batley, 436 Pa. 377, 390, 260 A.2d 793, 800 (1970). "A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." Commonwealth v. Widmer, 560 Pa. 308, 319, 744 A.2d 745, 751 (2000) (citing Commonwealth v. Karkaria, 533 Pa. 412, 625 A.2d 1167 (1993)). The Court must consider the evidence in the light most favorable to the Commonwealth, as verdict-winner. Commonwealth v. Morales, 625 Pa. 146, 158, 91 A.3d 80, 87–88 (2014).

> There is sufficient evidence to sustain a conviction when the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Further, we note that the entire trial record is evaluated and all evidence received against the defendant is considered, being cognizant that the trier of fact is free to believe all, part, or none of the evidence.

Id. (quotation marks and citations omitted). Accord In Interest of J.B., 189 A.3d 390, 408 (Pa. 2018) ("[I]n undertaking sufficiency review, we [do] not act in the capacity of a 'super-jury' to reconsider and re-determine the facts of the case adduced at trial and decide, anew, an appellant's guilt or innocence.").

"[T]he Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." Commonwealth v. Huddleston, 55 A.3d 1217, 1223 (Pa.Super. 2012) (citing Commonwealth v. Stays, 40 A.3d 160, 167 (Pa.Super. 2012)) (quotation marks and citations

14

committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

**"Principal."** A person who is the actor or perpetrator of the crime.

18 Pa.C.S. § 2502.

" 'To obtain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed, that the defendant was the killer, and that the defendant acted with malice and a specific intent to kill.' " Commonwealth v. Hicks, 638 Pa. 444, 461, 156 A.3d 1114, 1123–24 (2017) (quoting Commonwealth v. Laird, 605 Pa. 137, 988 A.2d 618, 624–25 (2010)). "Specific intent and malice may be inferred through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." Id. (citing Commonwealth v. Houser, 610 Pa. 264, 18 A.3d 1128, 1133–34 (2011)).

Regarding second degree murder, a defendant may be liable as a principal where he is engaged in the commission of an enumerated felony and a person is killed in furtherance of the felony. Commonwealth v. Lambert, 795 A.2d 1010, 1022–23 (Pa.Super. 2002). In Lambert, the Superior Court explained in detail the law and doctrine regarding second degree murder, commonly referred to as "felony murder."

> ¶ 40 Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S.A § 2502(d) defines perpetration of a felony as:
>
>> [t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.
>
> 18 Pa.C.S.A § 2502(d) (emphasis added). The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim.

16

¶ 41 The elements of accomplice liability for felony murder were addressed in *Commonwealth v. Middleton*, 320 Pa.Super. 533, 467 A.2d 841, 848 (1983):

> In *Commonwealth v. Waters*, 491 Pa. 85, 95, 418 A.2d 312, 317 (1980), the court discussed the elements to be proved in order to establish accomplice liability for felony murder, saying that:
>
> ... [t]he responsibility of persons, other than the slayer, for a homicide committed in the perpetration of a felony require[s] proof of a conspiratorial design by the slayer and the others to commit the underlying felony and of an act by the slayer causing death which was in furtherance of the felony.
>
> Moreover, it was stated by the court in *Commonwealth v. Legg*, 491 Pa. at 82, 417 A.2d at 1154:
>
> When an actor engages in one of the statutorily enumerated felonies and a killing occurs, the law, via the felony-murder rule, allows the finder of fact to infer the killing was malicious from the fact the actor was engaged in a felony of such a dangerous nature to human life because the actor, as held to the standard of a reasonable man, knew or should have known that death might result from the felony. (footnote omitted)
>
> *Middleton*, 467 A.2d at 848. In *Commonwealth v. Melton*, 406 Pa. 343, 178 A.2d 728, 731 (1962), *cert. denied*, 371 U.S. 851, 83 S.Ct. 93, 9 L.Ed.2d 87 (1962), our Supreme Court explained that not only the killer, but all participants in a felony, including the getaway driver, are equally guilty of felony murder when a killing by a felon occurs.
>
> ¶ 42 The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a principal or an accomplice in the perpetration of a felony. Whether evidence sufficiently indicates that a killing was in furtherance of a predicate felony can be a difficult question. The question of whether the killing was in furtherance of the conspiracy is a question of proof for the jury to resolve. It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. Rather, the fact finder determines whether the appellant knew or should have known that the possibility of death accompanied a dangerous undertaking.

Id. at 1022–23 (some citations omitted).

### 3. Robbery and conspiracy to commit robbery.

With regard to the crimes of robbery and conspiracy, the Crimes Code defines each as follows:

(1) A person is guilty of robbery if, in the course of committing a theft, he:

> (i) inflicts serious bodily injury upon another;

> (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury. . . .

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

18 Pa.C.S. § 3701(a). Regarding theft, "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a). Regarding attempt to commit theft, "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a).

> The Crimes Code defines conspiracy as follows.

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

> . . . .

> No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903(a), (e). "Proof of the existence of such a conspiracy may be inferentially established by proof of the relation, conduct or circumstances of the parties and the acts of the parties may demonstrate a concerted action pursuant to a common design to accomplish a

18

common purpose." Batley, 436 Pa. At 392, 260 A.2d at 801 (citing Commonwealth v. Neff, 407 Pa. 1, 179 A.2d 630 (1962)).

> Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

Commonwealth v. Olds, 322 Pa.Super. 442, 447-48, 469 A.2d 1072, 1075 (1983) (quoting Commonwealth v. Lamb, 309 Pa.Super. 415, 455 A.2d 678, 685-86 (1983)). Accord Commonwealth v. Mitchell, 135 A.3d 1097, 1102–03 (Pa.Super. 2016). Both a defendant's and a co-felon's acts may be considered by the jury in determining whether a conspiracy has been proven. Id. at 448, 469 A.2d at 1075. "The least degree of concert or collusion is sufficient to sustain a finding of responsibility as an accomplice." Commonwealth v. Coccioletti, 493 Pa. 103, 109, 425 A.2d 387, 390 (1981). Thus, a defendant does not have to take an overt act himself in order to be criminally liable for conspiracy; it is sufficient where the Defendant agrees to the conspiracy and an overt act is taken by *any* co-conspirator in furtherance of the conspiracy. E.g., Commonwealth v. Murphy, 577 Pa. 275, 292, 844 A.2d 1228, 1238 (2004) ("Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act."). "Once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy." Commonwealth v. Chambers, 188 A.3d 400, 410 (Pa. 2018).

19

## 5. Aggravated assault.

Under section 2702 of the Crimes Code, "[a] person is guilty of aggravated assault if he: (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. . ." 18 Pa.C.S. § 2702(a)(1). Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ," while bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. § 2301.

Evidence may be sufficient to prove aggravated assault based upon attempt even though serious bodily injury is not actually inflicted. Commonwealth v. Lopez, 439 Pa.Super. 625, 632–34, 654 A.2d 1150, 1154–55 (1995).

> When no serious bodily injury results from the accused's actions, the Commonwealth must prove that he attempted to cause another to suffer such injuries. *See Commonwealth v. Elrod*, 392 Pa.Super. 274, 277, 572 A.2d 1229, 1231 (1990), *allocatur denied*, 527 Pa. 629, 592 A.2d 1297 (1990) (proof that the accused attempted to cause serious bodily injury to another establishes crime of aggravated assault). Attempt, in the context of an assault, is established when the accused intentionally acts in a manner which constitutes a substantial or significant step toward perpetrating serious bodily injury upon another. This intent need not be directed at a specific person. *See Commonwealth v. Mosley*, 401 Pa.Super. 537, 552, 585 A.2d 1057, 1065 (1991) (firing shots into crowded area constituted attempt to cause serious bodily injury). Moreover, if the accused intends to cause serious bodily injury to another, then proceeds to perform all of the acts necessary to do so, the accused can still be guilty of aggravated assault even though completing an aggravated assault is impossible. *See also Commonwealth v. Smith*, 426 Pa.Super. 144, 155, 626 A.2d 614, 620 (1993) (where appellant, with finger on trigger, pointed unloaded gun at victim, pushed victim to floor, and threatened to kill victim, sufficient evidence to support appellant's aggravated assault conviction existed); *Commonwealth v. Chance*, 312 Pa.Super. 435, 443, 458 A.2d 1371, 1374-75 (1983) (where appellant pointed unloaded gun at victim and victim heard gun click several times, sufficient evidence to support appellant's aggravated assault conviction existed); *Commonwealth v. Bond*, 261 Pa.Super. 311, 315-16 n. 2, 396 A.2d 414, 416 n. 2 (1978) (same).

> Significantly, circumstantial evidence can prove that the accused intended to inflict serious bodily injury upon another. The finder of fact is free to conclude that the accused intended the natural and probable consequences of his actions to result therefrom.

Id. (footnote and some citations omitted).

> Attempt in this context is demonstrated by proving that the accused acted in a manner which constitutes a substantial or significant step toward perpetrating serious bodily injury upon another along with the intent to inflict serious bodily injury. *Commonwealth v. Alexander,* 477 Pa. 190, 383 A.2d 887 (1978). The *Alexander* Court made clear that an attempt under § 2701(a)(1) requires a showing of some act, albeit not one causing serious bodily injury, accompanied by an intent to inflict serious bodily injury.

Commonwealth v. Gruff, 822 A.2d 773, 776 (Pa.Super. 2003) (some citations omitted).

> Our Court's rulings, consistent with *Alexander,* focus on whether the record reflects evidence of an intent to inflict serious bodily injury. Aggravated assault can be demonstrated with proof of such intent regardless of whether it was impossible to actually cause serious bodily injury. *Commonwealth v. Lopez,* 439 Pa.Super. 625, 654 A.2d 1150 (1995). Likewise, aggravated assault can be found with proof of such intent regardless of whether any serious bodily injury resulted. Finally, aggravated assault can be found with proof of such intent even if no actual injury resulted.
>
> ¶ 14 In *Lopez,* an accused fired eight bullets at the front door of an empty residence of his girlfriend. The Court held that a prima facie case of aggravated assault was established by the Commonwealth if the accused possessed the requisite intent to cause serious bodily injury (for § 2702(a)(1)) . . . even though it was impossible for the accused actually to cause either serious bodily injury or bodily injury because of the absence of a person inside the residence. 654 A.2d at 1152.

Id. at 777 (some citations omitted).

"[P]ointing a gun at another may be aggravated assault under either §§ 2702(a)(1) or (a)(4), depending on the surrounding circumstances." Id. at 779, n.5. Indeed, various cases in Pennsylvania have held that the action of pointing a firearm at a person, when considered in conjunction with other threatening words and actions, is sufficient to convict for aggravated assault. E.g., Commonwealth v. Fortune, 68 A.3d 980, 986–87 (Pa.Super. 2013).

21

Appellant was not "merely pointing" the gun at the victim while making a conditional threat. Rather, his simultaneous demand to her to act was direct and uttered while he constantly pointed his weapon squarely at a vital part of her body and while he was holding the opposite end of the keys that were also still in her hand. As such, we find there was sufficient evidence from which a jury could have found that Appellant attempted to cause serious bodily injury upon the victim.

We further find there was sufficient evidence from which the jury could have concluded that Appellant took a substantial step towards inflicting serious bodily injury since he pointed a gun at the middle of the victim's forehead, threatened to kill her, and did not do so only because the victim fled. *See Matthew, supra* (finding a substantial step to inflict serious bodily injury had been taken where the appellant pushed a loaded gun against the victim's throat, threatened to kill him, and pointed it at him before fleeing the scene). "The only remaining step [A]ppellant would have had to take to inflict serious bodily injury upon [the victim] would have been to pull the trigger on the gun, which would have obviously caused serious bodily injury." *Matthew,* 589 Pa. at 494, 909 A.2d at 1259 (citation omitted).

Moreover, we hold there was sufficient evidence for the jury to conclude Appellant possessed the requisite intent to inflict serious bodily injury upon the victim when he threatened to "blow her head off." As was the case in *Matthew,* if this threat alone had not been enough to establish his intent, the jury properly could have determined it from his pointing of the gun at the middle of her forehead during the carjacking. *Matthew,* 909 A.2d at 1259 ("Where the intention of the actor is obvious from the act itself, the [fact-finder] is justified in assigning the intention that is suggested by the conduct.") (quotation omitted).

Id. See also Commonwealth v. Matthew, 589 Pa. 487, 495, 909 A.2d 1254, 1259 (2006) ("If the threats alone were not enough to establish [the defendant's] intent, the fact-finder could determine his intent from pushing the loaded gun against [the victim's] throat and otherwise pointing it at him.").

Finally, a defendant may be convicted of aggravated assault when a defendant shoots in the direction of a victim, even when the victim is not intended to be struck, and even when the victim does not actually suffer physical injury. Commonwealth v. Thompson, 559 Pa. 229, 241, 739 A.2d 1023, 1029–30 (1999). Accord Commonwealth v. Jackson, 955 A.2d 441, 450 (Pa.Super. 2008). See also Commonwealth v. Palmer, 192 A.3d 85, 94–99 (Pa.Super. 2018)

(evidence sufficient for jury to convict defendant of aggravated assault for attempt to cause serious bodily injury where defendant fired at car with multiple passengers, but it could not be determined which specific passenger, if any, the defendant intended to hit).

### 6. Recklessly endangering another person.

Under section 2705 of the Crimes Code, "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705.

> Recklessly endangering another person is a crime directed against reckless conduct entailing a serious risk to life or limb out of proportion to any utility the conduct might have. As a result, to support a conviction, the evidence must establish that the defendant acted recklessly in a manner that endangered another person. A person acts in a reckless manner when he consciously disregards a substantial and unjustifiable risk.

Commonwealth v. Vogelsong, 90 A.3d 717, 719 (Pa.Super. 2014) (citations and quotation marks omitted). "[I]n order to make out a *prima facie* case for recklessly endangering another person, the Commonwealth need only establish that the defendant's conduct placed or *may have placed* another in *danger* of serious bodily injury or death." Id. at 721 (quoting Commonwealth v. Cordoba, 902 A.2d 1280, 1288–1289 (Pa.Super. 2006)) (emphasis in original).

### 7. Carrying a firearm without a license.

Section 6106 of the Crimes Code prohibits the carrying of a concealed firearm without a license.

> Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S. § 6106(a)(1).

23

Although a separate crime exists prohibiting the possession or transportation of a firearm by a minor,[6] a minor may also be convicted under section 6106(a)(1) for carrying a concealed firearm as a person who is not otherwise eligible to be licensed. In re R.B.G., 932 A.2d 166, 170 (Pa.Super. 2007).

> Our review of Section 6106 leads us to conclude that nothing in its language precluded Appellant, despite his age, from being charged with a violation of the statute, nor does Appellant proffer any support for this position. Furthermore, Appellant has cited to no authority in support of his claim that Sections 6106 and 6110.1 are "incongruent" and therefore that he should not have been charged with both offenses.

Id. See also In re R.N., 951 A.2d 363, 369–70 (Pa.Super. 2008) (evidence sufficient to support convictions for carrying a firearm without a license and possession of a firearm by a minor).

"To prove possession of a firearm, the Commonwealth must establish that an individual either had actual physical possession of the weapon or had the power of control over the weapon with the intention to exercise that control. Possession may be proven by circumstantial evidence." In re R.N., 951 A.2d at 369–70 (citing Commonwealth v. Carter, 304 Pa.Super. 142, 450 A.2d 142, 144 (1982)).

## 8. Application of the law to the facts.

The Court must consider the evidence in the light most favorable to the Commonwealth, as verdict-winner. Commonwealth v. Morales, 625 Pa. 146, 158, 91 A.3d 80, 87–88 (2014).

> There is sufficient evidence to sustain a conviction when the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Further, we note that the entire trial record is evaluated and all evidence received against the defendant is considered,

---

[6] Section 6110.1 provides: "Except as provided in subsection (b), a person under 18 years of age shall not possess or transport a firearm anywhere in this Commonwealth." 18 Pa.C.S. § 6110.1(a). That crime was not charged in this case, however.

24

being cognizant that the trier of fact is free to believe all, part, or none of the evidence.

Id. (quotation marks and citations omitted).

First, regarding the conspiracy to commit robbery, the evidence admitted at trial showed that Defendant and the co-conspirators knew initially that Mathesius would be in the car, and that they agreed that a robbery of him would be committed. Based on the text messages sent from Mathesius, the conspirators later learned that Booher would also be in the car. Defendant and the co-conspirators then selected a location where the robbery would occur. Defendant went back to his house in order to retrieve a handgun for the intended purpose of committing the robbery. After contacting the victims using Foster's phone, Defendant directed Foster and Jones to wait at the side of building. Defendant then got in the car and actually committed the robberies of Mathesius, Booher, and N.R. by brandishing a gun, saying, "this is a stick up," and demanding and receiving drugs and money. The evidence therefore showed that the conspiracy to commit robbery evolved from an agreement to rob Mathesius, to an agreement to rob both Mathesius and Booher, and into the actual armed robbery of everyone in the vehicle. Thus, the evidence in this case was sufficient to prove the crime of conspiracy to commit robbery.

Second, the evidence showed that Defendant carried a firearm without a license. His age at the time of the offense was shown to be less than eighteen. He therefore could not have been issued a license to carry a concealed weapon. Captain Pudik testified that Defendant was under eighteen and therefore could not have been issued a license to carry a concealed firearm. The testimony of Jones, N.R., and Hicks, each established that Defendant carried a concealed firearm without a license. Jones testified to Defendant retrieving the firearm from his home, and then showing Jones where he had concealed it on his person by lifting up his hoodie. N.R. testified that Defendant, when asked if he had the money to purchase the marijuana, pulled out a handgun

25

instead, which he then used to commit the robberies. Hicks testified to Defendant later cleaning off the handgun and throwing it into some bushes. This evidence was sufficient to prove that Defendant possessed and carried a concealed firearm without a license.

Third, regarding the crimes of robbery, aggravated assault, and recklessly endangering another person, the evidence showed that Defendant retrieved his handgun from his home. He got into the victim's car after it pulled up. He said, "This is a stick up." He pointed his gun at the occupants, including N.R., and then demanded, and received, drugs and money. N.R. held his head down because he was afraid. Defendant then inflicted serious bodily injury upon Booher by shooting him five times in the area of his head and neck at point-blank range. Booher died from the gunshots. After killing Booher, Defendant exited the car. Defendant then moved to the back of the vehicle and continued to fire multiple shots into it, endangering the lives of everyone inside. Indeed, one of the shots he fired struck Mathesius in the back, resulting in his death as well. When Defendant fired the shots into the vehicle from the outside, he knew of the presence of each of the occupants. He had previously pointed the gun at the victims while inside. A reasonable inference may be made, therefore, that when Defendant continued to fire at the car from the outside, he intended to shoot and kill each of the occupants. Although N.R. was not actually struck, Defendant's actions of firing at the vehicle, knowing that N.R. was inside, is sufficient to prove aggravated assault. The case law is clear that a defendant may be convicted of aggravated assault when a defendant shoots in the direction of a victim, even when the particular victim is not the one specifically intended to be struck, and even when the victim does not actually suffer physical injury. See Thompson, 559 Pa. at 241, 739 A.2d at 1029–30; Jackson, 955 A.2d at 450; Palmer, 192 A.3d at 94–99. These facts are therefore sufficient to prove every

26

element of robbery for each of the victims, as well as every element of the crimes of the aggravated assault of N.R. and recklessly endangering another person.

Finally, regarding Defendant's convictions for the second degree murder of Booher and the first degree murder of Mathesius, there was considerable evidence admitted to show the conspirators' sophistication and malice in the planning and execution of the robberies. It was suggested that Jones act as a decoy. Defendant and Foster pooled their money to further the initial appearance that they were there to buy the drugs. Defendant used Foster's cellphone in order to arrange the meeting place where Mathesius and Booher would come, and where the robbery would take place. When the victims arrived in their car, Defendant got in. Upon entering the car, Defendant declared, "this is a stick up," and demanded drugs and money from the victims while brandishing a firearm. He threatened Mathesius, Booher, and N.R. with the handgun. He received drugs and money from Booher. Mathesius showed him his empty wallet. N.R. concealed money in the car seat to prevent it from being stolen before crouching down in fear. Defendant then fired the fatal shots that killed Booher from only a car seat away. One of the shots was fired while pressed tightly against Booher's mouth. By killing Booher, Defendant eliminated an eyewitnesses and prevented any possible resistance or retaliation by him. Thus, the killing by Defendant was committed in furtherance of the conspiracy and in furtherance of the robbery, a violent felony which serves as a statutory predicate for second degree murder. The evidence was therefore sufficient to convict Defendant of the second degree murder of William Cade Booher.

After getting out of the car, Defendant did not immediately flee the scene. Rather, he continued to fire into the rear of the occupied vehicle. Mathesius, who was still inside and unarmed, was struck in the back by one of the bullets, and later bled to death from the gunshot

27

wound. This evidence tended to show Defendant's specific intent to kill. That is, after Defendant had killed one victim of the robbery, he exited the car. Defendant had just robbed Mathesius and would have known that he was still inside. Rather than simply fleeing the scene with the proceeds of the robbery, Defendant moved towards the rear of the vehicle and continued to fire into it, utilizing the same deadly weapon he had just killed with. One of the shots Defendant fired struck Mathesius in a vital part of his body, penetrating his right lung and subclavian vein, causing Mathesius to bleed internally, and resulting in his death. Defendant then ran down the street where he met his coconspirators, telling them that he "pushed his shit back." He later cleaned the murder weapon, disposed of it in some bushes, and admonished Jones via Snapchat not to say anything. This evidence was sufficient to establish the malice and the specific intent necessary to convict Defendant of the willful, deliberate, and premeditated killing of Dane Mathesius.

Because the evidence presented at trial was sufficient to convict Defendant of each of the charges, Defendant's claim has no merit and should be denied.

## B. The jury's verdict was not against the weight of the evidence.

Defendant claims that the jury's verdict was against the weight of the evidence. In Commonwealth v. Jacoby, 170 A.3d 1065, 1080–81 (Pa. 2017), the Supreme Court of Pennsylvania summarized the law regarding challenges to the weight of the evidence.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. When a trial court considers a motion for a new trial based upon a weight of the evidence claim, the trial court may award relief only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. The inquiry is not the same for an appellate court. Rather, when an appellate court reviews a weight claim, the court is reviewing the exercise of discretion by the trial court,

not the underlying question of whether the verdict was against the weight of the evidence. The appellate court reviews a weight claim using an abuse of discretion standard.

At trial, a jury is the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses. Issues of witness credibility include questions of inconsistent testimony and improper motive. A jury is entitled to resolve any inconsistences in the Commonwealth's evidence in the manner that it sees fit.

As noted, inconsistencies in eyewitness testimony are not sufficient to warrant a new trial on grounds that the verdict was against the weight of the evidence.

Id. (citations, quotation marks, and brackets omitted).

"A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." Widmer, 560 Pa. at 319, 744 A.2d at 751 (citations omitted). While "[a] claim challenging the sufficiency of the evidence, if granted, would preclude retrial . . . a claim challenging the weight of the evidence if granted would permit a second trial." Id. at 318, 744 A.2d at 751.

The Commonwealth presented a variety of witnesses, some of whom testified multiple times. The Commonwealth introduced numerous items of documentary and physical evidence. The Commonwealth presented the testimony of N.R., who was present during the shooting, as well as the testimony of Jones, Hicks, and Fisher, who were each present during, and heard discussions related to, the planning of the robbery. The Commonwealth further presented evidence of the surveillance footage from Plan 12 Market, showing the meeting of the co-conspirators, as well as evidence of the extraction of Mathesius' cellphone, showing the text messages which were sent back and forth between Mathesius and Foster's cellphone, which Defendant also used as part of the conspiracy. The Court concludes that the evidence presented

29

by the Commonwealth in this case was of sufficient weight to support the jury's verdict for each of Defendant's convictions.

Defendant chose not to testify, but his counsel argued against the credibility of Jones and Hicks, who each implicated him in the crimes. The jury was entitled, however, either to believe or disbelieve the testimony of Jones and Hicks. Jacoby, 170 A.3d at 1080–81. Nor is it the role of the Court to second-guess the jury, unless its verdict would result in a denial of justice. Widmer, 560 Pa. at 319-20, 744 A.2d at 752 (quoting Commonwealth v. Brown, 538 Pa. 410, 648 A.2d 1177 (1994)) ("Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' "). The Court does not believe there is anything unjust about the jury's verdict in this case.

Because the jury's verdict was not against the weight of the evidence, Defendant's claim has no merit and should be denied.

## C. The Court did not impose an illegal sentence and did not abuse its discretion.

Defendant claims that the sentence imposed by the Court is illegal, arguing that it constitutes a *de facto* life sentence. Defendant also argues that the Court abused its discretion by imposing consecutive sentences for each murder committed, rather than running the sentences concurrently.[7] In its June 22, 2018 Opinion entered at the time of sentencing, the Court explained

---

[7] In Commonwealth v. Bebout, 186 A.3d 462, 470 (Pa.Super. 2018), the Superior Court recited the standard of review for challenges to the discretionary aspects of sentencing.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its

30

in detail its reasons for the sentence it imposed. The Court also explained its reasons at the time of the sentencing hearing. N.T., Sentencing Hearing, 6/22/2018, at 46-64. The Court addressed in particular the issue of *de facto* life sentences, and stated the legal reasons, and the supporting factual basis, for why the sentence imposed does not constitute such a *de facto* life sentence.

Specifically, the Court found that there was a number of aggravating circumstances in this case, there were multiple violent crimes against multiple victims, and the particular facts of this case militated towards the imposition of consecutive sentences for the two murders committed. In determining an appropriate sentence, the Court relied upon the Supreme Court's decision in Commonwealth v. Batts, 640 Pa. 401, 163 A.3d 410 (2017). The Court also relied upon the Superior Court's decisions in Commonwealth v. Brooker, 103 A.3d 325 (Pa.Super. 2014); Commonwealth v. Foust, 180 A.3d 416 (Pa.Super. 2018); and Commonwealth v. Bebout, 186 A.3d 462 (Pa.Super. 2018). Foust in particular indicates that "volume discounts" are disfavored under Pennsylvania law, particularly where multiple violent crimes are committed against multiple victims. Foust, 180 A.3d at 438. Foust also held that whether a sentence constitutes a *de facto* life sentence must be considered by looking at the individual sentence for each criminal conviction, and not the aggregate sentence for all of the convictions. Id. In this case, after considering all of the available evidence and the various factors relevant to fashioning an individualized sentence for Defendant, who was a juvenile at the time of the offense, the

---

judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

Id. (quoting Commonwealth v. Hoch, 936 A.2d 515, 517–18 (Pa.Super. 2007).

It is well settled that "imposition of consecutive rather than concurrent sentences rests within the trial court's discretion." *Commonwealth v. Harvard*, 64 A.3d 690, 703 (Pa. Super. 2013), *appeal denied*, 621 Pa. 687, 77 A.3d 636 (2013) (citation omitted). Moreover, extensive case law in this jurisdiction holds that defendants convicted of multiple offenses are not entitled to a "volume discount" on their aggregate sentence.

Commonwealth v. Foust, 180 A.3d 416, 434 (Pa.Super. 2018). The claim appears to raise a substantial question. Id. at 439. Nevertheless, for the reasons state in the Court's June 22 Opinion, the Court did not abuse its discretion.

31

Court imposed the mandatory minimum sentence for each murder conviction under 18 Pa.C.S. § 1102.1.

Following the Court's June 22 Opinion, the Superior Court has decided additional cases in this area of the law. In Commonwealth v. Olds, 192 A.3d 1188, 1197–98 (Pa.Super. 2018), the Superior Court affirmed the resentencing of a juvenile, holding that imposition of the mandatory maximum term of life imprisonment for conviction of second degree murder as an accomplice was constitutional.

In Commonwealth v. White, 193 A.3d 977 (Pa.Super. 2018), the Superior Court upheld another resentencing of a juvenile to a term of thirty-five years to life imprisonment, finding that the sentence was not a *de facto* life sentence. The Court in White further held that consideration of Miller factors is unnecessary where a sentence of life without the possibility of parole is not imposed. Id. at 983 (citing Commonwealth v. Machicote, 172 A.3d 595, 602, n.3 (Pa.Super. 2017)).[8]

In Commonwealth v. Nedab, 2018 PA Super 257, --- A.3d ---- (Pa.Super., Sept. 18, 2018) the Superior Court affirmed the dismissal of a PCRA Petition as untimely, and held also that the decision in Foust regarding *de facto* life sentences has not been held to be a retroactively applicable right either by the Supreme Court of Pennsylvania or the Supreme Court of the United States. In footnote 3 of that Opinion, the Superior Court in Nedab reaffirmed the principle in Foust that *de facto* life sentences must be analyzed by considering each individual sentence for each individual criminal conviction, and not by looking to the aggregate sentence. "Since the aggregate sentence must be broken down into the individual sentences under *Foust*, there is no way that a 10 to 20-year sentence would constitute a *de facto* sentence of life without the possibility of parole." Id.

---

[8] As observed by the Superior Court, allocatur has been granted in Machicote before the Supreme Court.

These new cases only serve to reaffirm and support the reasons stated by the Court and the precedents it relied upon in its June 22 Opinion. The Court believes the reasons stated in that Opinion adequately explains why the sentence imposed in this case is not a *de facto* life sentence. The Court also believes the reasons stated in that Opinion adequately explain why the consecutive sentences were imposed for each of the two separate murder convictions, and why imposition of consecutive sentences in this case was not an abuse of discretion. A copy of that Opinion is attached as Appendix "A," and is incorporated by reference as if fully set forth herein. For the reasons stated in that Opinion, the Court did not impose an illegal sentence and did not abuse its discretion.

Because the Court did not impose an illegal sentence and did not abuse its discretion, Defendant's claims have no merit and should be denied.

## IV. CONCLUSION

For the reasons stated in this Opinion and for the reasons stated in the Court's Opinion entered June 22, 2018, each of Defendant's claims has no merit, and the Sentence Order of the Court should be affirmed.

BY THE COURT:

_____ J.

33